Filed 8/11/21  In re S.S. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| In re S.S., a Person Coming Under Juvenile Court Law. | B308276 |
| _____ | (Los Angeles County Super. Ct. No. 20CCJP02617A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|       Plaintiff and Respondent, | |
|       v. | |
| A.J., | |
|       Defendant and Appellant; | |
| R.S., | |
|       Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tem.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

Linda Puertas, under appointment by the Court of Appeal, for Respondent.

The juvenile court in this dependency matter found that, in an attempt to gain an advantage in a custody dispute, mother A.J. coached her five-year-old daughter S.S. (child) to accuse her ex-husband R.S. (father) of physical and sexual abuse. Child was declared dependent due to the emotional abuse inflicted by *mother's* conduct. The dependency court then terminated jurisdiction with an award of full legal and physical custody to father, with mother to have monitored visitation. Mother appeals, arguing the court denied her due process at the adjudication hearing and abused its discretion in its disposition of the matter. We affirm.[1]

### *FACTUAL AND PROCEDURAL BACKGROUND*

**1.    *Overview***

Child was born in March 2014. Mother and father separated in 2018 and divorced in February 2019. For some time after the separation, child lived with mother's parents in Minnesota, by agreement. Father sought, and obtained, weekend visits, beginning in June 2019. In the interim, mother married W.J. (stepfather). Child returned to California and lived with mother, stepfather, and their infant daughter (stepsister). Mother and stepfather sought to move the whole family back to Minnesota indefinitely.[2]

---

[1]    Both the Los Angeles County Department of Children and Family Services (DCFS) and father are respondents in this appeal. Each filed a respondent's brief.

[2]    Mother would testify that she had 71 percent custody and that she therefore could have moved child to Minnesota without court approval at any time. However, other evidence showed that

In December 2019, mother commenced a six-month campaign of accusing father of sexually and physically abusing child, with the apparent goal of terminating father's custody rights. She coached child to accuse father, requiring child to participate in a number of forensic interviews and invasive physical examinations.

In May 2020, DCFS filed a petition alleging child was dependent due to mother's emotional abuse and failure to protect. (Welf. & Inst. Code, § 300, subds. (b)(1) & (c).) Child was detained from mother and placed with father. In September 2020, the court sustained the allegations at the adjudication hearing. The court found true that mother "created a detrimental and endangering situation for the child . . . in that since December 2019, the mother has made numerous allegations of physical abuse and sexual abuse of the child against the child's father . . . . The mother subjected the child to numerous forensic examinations, including invasive genital examinations. The mother subjected the child to further interviews with social workers and law enforcement officers on additional occasions. The mother's allegations of physical abuse and sexual abuse of the child by the father remain unsubstantiated. The child has been observed by mental health providers to exhibit dysregulation and have tantrums in sessions. The detrimental and endangering situation established for the child . . . by the mother endangers the child's physical health and safety, and places the child[] at risk of physical harm and damage."

---

mother believed she needed court approval to terminate father's custody and visitation rights in order to relocate.

Jurisdiction was then terminated, with father awarded full custody.

**2.    *Specific Instances of Mother's Misconduct***

As mother does not challenge the sufficiency of the evidence supporting the trial court's adjudication of dependency, we need not detail the course of mother's numerous allegations against father and the lengthy law enforcement investigation establishing the charges were unfounded.[3]  Instead, we briefly discuss two of the more egregious incidents and additional evidence that mother had coached child to lie about father.

A.    *Blaze Pizza Incident*

On March 13, 2020, child, who was then nearly six years old, had a visit with father and father's relatives at Blaze Pizza.

---

[3]    The allegations were taken seriously by law enforcement and DCFS.  Not only did they conduct numerous interviews and examinations of child, they responded to mother's claims that father took inappropriate photos of child by having the FBI perform a full "data dump" on father's phone, to check whether any such photos had been deleted.  Nothing untoward was found.  In addition, when mother first claimed sexual abuse, police obtained four pairs of child's underwear from the family hamper and examined them for sperm and father's DNA.  Sperm was detected in the crotch of one of the panties, and male DNA was detected on the interior and exterior of all four pairs.  Father was excluded as a contributor of the discovered male DNA.  Further testing revealed stepfather as a source of non-sperm male DNA on the interior and exterior of one pair of the panties.  This resulted in an amended petition being filed alleging sexual abuse against stepfather, and the detention of stepsister from mother and stepfather.  Mother and stepfather suggested the DNA and sperm were the result of cross-contamination in the family hamper.  At the adjudication hearing, DCFS dismissed the allegations against stepfather, and stepsister was returned home.

4

After child came home, mother called stepfather and told him child was acting erratically and had told her father molested her in the bathroom of Blaze Pizza. Stepfather immediately drove to the restaurant, where he attempted to obtain surveillance video, and called the police.

Police interviewed mother, who said that after the visit, child had a tantrum. According to mother, child took her pants and underwear off and told mother that father had "poked" her buttocks. Mother saw redness on child's buttocks and expected police to examine child. Police interviewed child, who told police she needed to be with mother because "my mommy tells me what to say." Child said mother told her that once father goes to jail, they will be able to move to Minnesota, which is where her grandparents live and her favorite place to be. When asked what happened at Blaze Pizza, child told police that, after everyone had finished eating, father took her to the bathroom to wash her hands. Inside the bathroom, father took his clothes off and put them back on several times. She saw his chest and stomach, but not his buttocks or penis. She never took off her pants, nor did father touch her. At mother's request, child was examined by a Center for Assault Treatment Services (CATS) nurse. "During the interview, [child] did not provide any details regarding [mother]'s alleged molestation accusation. [Child] did mention that she had a hard time remembering what to say without her mother being with her." (Italics omitted.) While at CATS, mother told the police that the judge was going to increase father's visitation if everything was okay, and she had been advised by her lawyer to gather as much evidence on father as she could to ensure that visitation would not change to father's benefit.

Three days later, two DCFS social workers went to mother's home for further investigation. A social worker interviewed child privately and asked about Blaze Pizza; child said she could not remember what happened. When the social worker continued asking, "child stated that she couldn't remember and went upstairs to her mother." When child came back downstairs; she said she remembered. She drew a picture of father and his relatives and said they were mean people. Before child could be questioned further, mother interrupted and said child was late for a therapist's appointment.

Police obtained the surveillance video from Blaze Pizza. It revealed that father took child to the restroom to wash her hands. Child was in the restroom for 49 seconds. Father held the door open with his foot the entire time. The detective told the social worker that he confronted mother after reviewing the video and told her there was no evidence that anything occurred. Mother responded that other incidents happened a few months ago. The detective stated "it appears that mother is making stuff up and child is being coached by mother."

B. *Father's April 24 Visit*

The second incident we describe took place the following month on April 24, 2020. Father visited child at the home of a paternal aunt. By this time, child visitation exchanges were taking place in the parking lot of a local police station. Father and paternal aunt picked up child at the police station and brought her to paternal aunt's home. They had a pleasant visit, and father ended the visit early, returning child to the police station parking lot.

After the exchange, mother walked child into the police station, claiming that as soon as she picked child up, child said

she wanted to speak to an officer.  Mother said she did not know what child wanted to say to the police, because child did not discuss it with her.  Police interviewed child, who said father spanked her on her buttocks and was mean.  She said he hurts her, spanks her and takes pictures of her private parts.  She said he poked her vagina and buttocks with his finger.  The officer asked how many times, she said "sixty ninety five [*sic*]."  When asked when this had happened, child said it was that day.  She said father tried to kick her on her chest, back, and knees.  She said she had a bruise on her knee and tried to look for it to show the officer, but could not find it.  When asked the difference between good and bad, she explained that her mother's side of the family is good and her father's side is bad.  After the interview, the officer approached mother.  Mother asked if child had told the officer about paternal aunt hurting child, which the officer thought strange, as mother had previously indicated she did not know anything child was going to say to the police.  Later, while the officer spoke with mother, child spoke with a police sergeant about her summer plans.  She said they plan to move to Minnesota after father gets arrested.  Child asked if father was going to get arrested today or tomorrow.

Unbeknownst to mother, a DCFS social worker had monitored the visit at paternal aunt's house.  Child had not been out of view of the social worker at any time – not even to use the restroom – and there was no abuse or anything at all concerning.  Child had been comfortable with father during the visit and showed affection towards him, resting her head on his shoulder while watching television.  Mother had, apparently, fabricated everything.

C.    *Other Incidents of Coaching*

At the adjudication hearing, mother took the position that although the allegations of abuse were unsubstantiated, child had made the allegations herself, and mother had been properly protecting her child by reporting child's serious accusations.

The fact that child told police, "my mommy tells me what to say" following the Blaze Pizza incident was strong evidence that the claims of abuse originated with mother, not child. But this was not the only time child told someone she had been coached. In December 2019, following mother's first report that father was abusing child, child gave a full statement to a DCFS social worker, then said she had one last thing to say. She "phrased her words in a certain way indicating that Mother had told her these things about Father and what was going on in his home." During an April 9, 2020 interview, the DCFS social worker asked child why she doesn't like father; she replied, "I don't know why I don't like him, who knows what the answer will be." On April 10, 2020, child told police that father physically abused her, but did not mention sexual abuse. Once the officer was finished interviewing child, mother continued to ask child if she had more to tell the social worker; child answered, "only if you want me to."

A number of police officers and DCFS social workers who had interviewed child and taken reports from mother all reached the same conclusion: mother had coached child.

3.    ***The Adjudication and Disposition Hearings***

Prior to the adjudication hearing, father asked the court to require DCFS to assess whether the case could be closed at the adjudication hearing with an order awarding custody to father. The court directed DCFS to submit that assessment in a last minute information.

On September 15, 2020, DCFS filed its last minute information, which recommended declaring child a dependent and then terminating jurisdiction, giving father sole legal and physical custody. The report stated that mother "continues to cause disruption and is unable to maintain healthy communication with father for coparenting purposes." (Italics omitted.) Specifically – although not exclusively – father reported "that he is having difficulty with the school district and logging into the [child's school] portal as the Mother continues to log in and undo all of the changes that . . . he makes."

At the adjudication hearing, mother objected to receipt of the last minute information as unrelated to jurisdiction. The court overruled the objection, indicating it would give the last minute information the appropriate weight, if any.

Mother testified in her own behalf, claiming that she had never coached child, but simply reported what child had voluntarily disclosed to mother. She testified that stepfather was present on one occasion when child disclosed abuse; she specified this was "at the hospital." She conceded that, although stepfather had called the police from Blaze Pizza, she had told stepfather about child's allegations.

Mother generally denied doing anything wrong with the school portal but admitted that she did, in fact, change the emergency contact information, but only to identify herself and her parents as emergency contacts, after father had deleted them.

Mother then called stepfather to testify. DCFS and father objected under Evidence Code section 352. The court asked mother's counsel what he intended to elicit that was not already in the DCFS reports. Counsel responded that he would ask

9

stepfather whether he ever heard mother coaching child and whether he heard child make claims "basically, to corroborate mother's version, that it was [child] that made the disclosure of being abused." The court sustained the objection, on the basis that stepfather's testimony would be cumulative of his statements already in the DCFS reports.[4]

The court took the matter under submission. The following day, it held another hearing and adjudicated child a dependent, stating: "This case is a case of a parent who has unhealthy obsessions who has made multiple police reports in the court's view attempting to manipulate the police into commencing criminal charges against the father. It's riddled with efforts by the mother to falsely accuse the father of abuse, and it's evident to the court that this child has been coached." The court added, "The mother has shopped around for therapists to – in order to require a third-party report. And the report – and the incident which really demonstrates to what extent the mother – steps she

---

[4]     Specifically, after counsel made his offer of proof, the court asked, "Isn't that what's contained in the reports?" Mother's counsel responded, "Well, if the court's willing to accept that then --." At that point, the court responded that the testimony would be cumulative, so sustained the objection. In its respondent's brief on appeal, DCFS interprets this exchange as mother's counsel indicating a willingness that the court accept the statements in the reports in lieu of stepfather's live testimony. In her reply brief, mother responds that the court did not allow counsel to complete his sentence, and the court's ruling was not invited. This much is clear: mother at no point suggested that stepfather's testimony would be any different from his statements recorded in the DCFS reports. Nor did mother seek to cross-examine the social workers regarding the contents of the reports.

10

will take to make certain that the father's rights to this child are forever severed was the incident at the pizza [restaurant] where the video was viewed by the police department, police detectives, no basis on their behalf to believe that any such acts occurred." The court characterized mother's conduct as "reprehensible."

Following the court's ruling on jurisdiction, the parties contested disposition. DCFS and father argued for termination of jurisdiction with a family law order granting father sole legal and physical custody with mother to have monitored visitation only; child's counsel did not separately argue, but submitted on DCFS's recommendation. Mother did not object to terminating jurisdiction with a family law order, but requested joint legal and physical custody, and unmonitored visitation.

The court terminated jurisdiction and granted sole legal and physical custody to father, with mother to have monitored visitation. The court explained that the reason for its custody ruling was that mother had shown herself unable to cooperate with father and, instead, would go behind father's back to "sabotage the school emergency contact list."

Mother filed a timely notice of appeal.

### DISCUSSION

Mother does not challenge the sufficiency of the evidence on appeal.[5] Instead, she identifies two evidentiary rulings – the admission of the last minute information and the exclusion of stepfather as a witness – and claims they were not only erroneous, but constituted a denial of due process, not subject to

---

[5]     In her reply brief mother expressly concedes she does not raise a substantial evidence challenge to the jurisdictional or dispositional findings. She repeated the concession at oral argument.

11

harmless error review. She also asserts the court abused its discretion in denying her joint physical and legal custody.

1. ***There Was No Error in Admitting the Last Minute Information***

On appeal, mother argues the admission of the last minute information constituted structural error, because she had not received the document a sufficient number of days in advance of the hearing. (See Cal. Rules of Court, rule 5.690(a)(2) [the social study for a disposition hearing must be submitted to the clerk at least 48 hours before the disposition hearing, and the clerk must make copies available to the parties and attorneys].)

The last minute information indicated that father claimed "that he is having difficulty with the school district and logging into the portal as the Mother continues to log in and undo all of the changes that . . . he makes." Mother objected to admission of this exhibit on the basis that it did not go to jurisdiction, but instead "goes more to the progress and the events that occurred after the fact." Counsel also expressed, "There is some information in there that if I had more time, I would refute; but it comes after the fact and it doesn't really relate to jurisdiction[.]"

The trial court overruled the objection and said it would give the last minute information the appropriate weight in considering jurisdiction and disposition. However, it does not appear that the court relied on the last minute information in its jurisdictional finding at all; mother's interference with the portal was relevant only to the court's ruling on disposition. In that respect, mother's objection that the last minute information related only to disposition and not jurisdiction was, in practical effect, sustained.

12

Mother's counsel's statement that "[t]here is some information in there that if I had more time, I would refute" was neither an objection to the court's consideration of the information at the disposition hearing nor a request for continuance.[6]  There was therefore no error in denying it.  Even if the court erred in admitting the last minute information, nothing in the record or mother's argument supports mother's claim that she was denied due process.  While the *complete omission* of DCFS's required reports prior to a hearing may rise to the level of a due process violation, when the report is prepared and is made available in advance of the hearing, deficiencies in the report go the weight of the evidence, and will not ordinarily amount to a deprivation of procedural due process.  (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.)

In the absence of a due process error, any admission of the document was harmless as a matter of law.  Mother testified that father's representation, as recorded in the last minute information, was, for the most part, true.  She had logged in to the portal to put herself in as child's mother and her parents as child's emergency contacts.  While mother did not admit to

---

[6]  Under California Rules of Court, rule 5.690(a)(2), "[a] continuance within statutory time limits must be granted on the request of a party who has not been furnished a copy of the social study in accordance with this rule."  The parties dispute whether a last minute information constitutes a "social study" subject to this rule, and whether the notice requirement of the rule was satisfied.  This dispute is immaterial; mother objected to the admission of the last minute information as not relevant to jurisdiction; she did not seek a continuance of the disposition hearing.

undoing "all" father's changes, it was undisputed that she had, in fact, logged in and change several of father's portal entries.

2. ***There Was No Error in Excluding Stepfather's Testimony***

The trial court excluded stepfather's proffered testimony as cumulative. (Evid. Code, § 352 [court may exclude evidence if the probative value is substantially outweighed by "the undue consumption of time"].) We review the court's evidentiary rulings for abuse of discretion, upsetting the ruling only if the trial court exceeded the bounds of reason. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911.)

Here, DCFS's reports, already admitted into evidence, reflected a number of interviews with stepfather, in which he sided with mother – indicating that she did not coach child and that child herself claimed abuse. Mother argues these recorded interviews were a poor substitute for stepfather's live testimony, and that he was the one witness who could confirm that mother did not coach child.

Mother greatly overstates the relevance of any testimony stepfather could give. Stepfather was not present in the home when child allegedly disclosed to mother that father molested her in the bathroom at Blaze Pizza, nor was he present in the car in the police department parking lot when child allegedly asked to speak to police about father's conduct during the April 24 visit that DCFS had monitored. The same is true as to two other visits when mother claimed child reported abuse when mother picked her up in the police department parking lot. Stepfather's statements, as described in DCFS's reports, reflect that he claimed child behaved erratically when she first returned from visits with father in July 2019 and that she eventually disclosed

14

physical abuse to him.  But stepfather could give no testimony as to the vast bulk of the claimed instances of coaching, as he was simply not present during the mother/child conversations that led to the accusations.

The court reasonably found that this minimally-relevant testimony was outweighed by the consumption of time it would take for stepfather to testify, and repeat the statements already in evidence.

This proper application of Evidence Code section 352 does not constitute a due process violation.  "While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings 'are not entitled to full confrontation and cross-examination.' [Citation.]  Due process requires a balance.  [Citation.]  The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.  [Citations.]" (*Maricela C. v. Superior Court* (1988) 66 Cal.App.4th 1138, 1146–1147.)[7]

---

[7]    Mother cites *People v. Reeder* (1978) 82 Cal.App.3d 543, 553 for the proposition that Evidence Code section 352 must give way to the right of the defense to present its case.  *Reeder* was a criminal appeal that considered the role of section 352 when the evidence was relevant to one codefendant but prejudicial to the other codefendant.  The answer lay in the proper application of rules regarding joinder and severance.  *Reeder* was not a juvenile dependency case and had nothing to do with undue consumption

**3.** ***The Disposition Order Was Within the Court's Discretion***

Finally, mother argues the court abused its discretion by awarding father full legal and physical custody and limiting her to monitored visits. "We normally review the juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to [Welfare and Institutions Code] section 362.4 for abuse of discretion . . . ." (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) We may find such abuse only if the court's determination was unreasonable or arbitrary. (*In re J.M.* (2020) 50 Cal.App.5th 833, 846.)

Mother argues, "Given [mother's] unwavering love for her daughter and the history of the loving care that [mother] had provided [child], the juvenile court's decision awarding sole legal and physical custody to [father] was an abuse of discretion. [¶] For similar reasons, the juvenile court abused its discretion when it limited [mother] and [child] to two, two-hour monitored visits per week. Limited, monitored visits between [mother] and [child] will have the unfortunate effect of straining the loving relationship between mother and daughter because the limited contact and the constant surveillance will make it difficult for [mother] and [child] to interact in a normal, natural, and fully loving way. This simply is not in [child]'s best interests."

Mother's one-sided argument fails to address meaningfully the evidence supporting the court's exercise of its discretion.

---

of time. The present case has nothing to do with joinder and severance of criminal defendants. Cases are not authority for propositions not considered. (*In re I.S.* (2002) 103 Cal.App.4th 1193, 1198.)

When mother had unmonitored contact with child, she attempted to poison the child against father.  In fact, when mother first was served with the removal order for child and began packing child's belongings, mother and stepfather continued to speak negatively about father in child's presence, despite the social worker's repeated admonitions not to do so.  Mother conceded that she and father had been unable to coparent.  She admitted that, after child had been detained with father, she made changes to child's school information to include herself and her family.  That mother says she loved child is not the point.  Mother emotionally abused child by using her as a pawn in her campaign to have father unjustly incarcerated as a child molester.  The court's conclusion that it was in child's best interests for her father to have sole custody and her visits with mother to be monitored for her own emotional and physical well-being was not an abuse of discretion.

### DISPOSITION

The jurisdiction and disposition orders are affirmed.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


MOOR, J.

17